Your argument in our second case, Plotnick v. Computer Sciences Corporation, 16-1606, whenever the lawyers are ready. It's fine, you can wait a minute. I've been in that spot. Thank you, Your Honor. May it please the Court, Matthew Wessler for the appellants. This is not your typical ERISA case. It involves a retirement plan that is not governed by trust law or any of ERISA's substantive provisions. Instead, the retired employee's only protection are principles of contract law. When CSC established a deferred compensation top hat plan, it made an offer to its employees. Loan us your present-day compensation in exchange for a stable, predictable, and secure source of income when you ultimately retire. The employees accepted this offer not by signing their name on the dotted line, but through performance, by remaining at the company until retirement and electing their payout scheme the day after they retired. This appeal turns on whether a company is free to alter the terms of its retirement plan after an employee accepts them by completing performance. Had that not occurred once before? No, Your Honor. The only amendment that occurred once before involved technical changes based on requirements to the IRS code. What happened here was different. Never before had this company applied the substantive amendments that they made unilaterally in 2012 to already retired employees. There are three changes that the company made to this plan. One involves the crediting rate, of course, but there are two fundamental additional changes that transformed this plan from the stable and predictable source of retirement income to this more volatile plan that they implemented as a cost-cutting mechanism. The first is that before 2012, the plan had never, ever required that retired employees' accounts be charged losses. After 2012, the company changed the language of the plan so that the accounts not only would be charged gains that the market had, but also losses. And I had a factual question about that as well, because even under the plan, as it existed prior to the agreement, there was that true-up phase at the end. Why would that not have had to capture the losses that occurred along the way? Because the language in the plan itself barred the company from actually doing that. Then what's the point of the true-up? The true-up is to make marginal changes in the last payout based on a kind of accounting that went on where the 10-year averaging of the Merrill Lynch crediting rate wasn't actually accounted for in the last payout. What the company did here, though, was quite different. What the individuals here seem to be objecting to is the volatility and the requirement of a far more active hands-on management than a more evened-out investment axis along the way. But it was my understanding that there are nevertheless swings in the market, even under a more stable investment vehicle, and it was my understanding that the last payout, the final payout, was what was designed to reflect those swings. Is that correct? Not quite, Your Honor. The last payout was designed to address marginal differences in the accounting that occurred. Now, could it be less? Maybe I'll answer it this way. It could end up, let me try to be clear, it could end up under the terms that the employees accepted when they retired, not the principal account. What could end up happening is that there could be a slightly different annual payout that the employees received on their last payout. But what could not happen is that a slightly lower or higher annual payout. So under the plan, the named plaintiffs in this case elected a 10- or 15-year payout, and the plan ended up being a slightly lower or higher annual payout, and guaranteed them each one of those annual payouts will be a fixed amount. I think you're floating into it. You remember you started with there are three different things? Yes. I think you're floating into a different one. Yes, there are three. I didn't get to my third. The second was that the plan promised to shield the accounts from losses. That's the point we didn't understand. In explaining it, you're floating into the third. Well, the way the court can understand it is to look at the difference in the language of the amendment. Before 2012, I'm sure you did, Your Honor, but the language is different. It's the source of a great deal of my confusion. Okay, I understand. And let me again try to be clear, although I don't want to lose sight of the third fundamental. Yes, but the language changed, and that's what we know happened. There's no dispute that before 2012, on this particular question, the plan shielded the accounts from losses by using the language, and this is at, Your Honor, JA-411, 433, and 34. And it said that earnings shall be credited. So any earnings under the Merrill Lynch averaging shall be credited to the account. It would be helpful to me. First of all, you make a decision that this should be treated like a unilateral contract. We accept that. Then you look at the three instances, the three instances in which you allege there's a wrong figure. And from my perspective, it seems as though you could prevail on one, maybe not the other two, but you've got to look at the plan to see if the plan would allow any of these to exist. Could I please understand the loss thing? What I want to do is cabinet so he would at least answer it relative to one of the three. And so if you're talking in crediting rate, talk crediting rate with this. If you're talking distribution, talk distribution or risk. Those are the three things that you make here, and which of the three are you answering Judge Duncan's question? It's the third. As I understand it, it's the third. It's risk. I mean, it's shielding the account. And I'm making a very limited point here, Your Honor, which is we know the plan changed. We know that before 2012, on the risk, the plan said only that the account, and this is again at JA-433 and 341, that earnings shall be credited. The amendment changed that language. So after 2012, and this is at JA-226, the company amended the plan on this particular feature, and it wrote the earnings shall be credited to, and then it added or charged against. And the problem that I have with that answer is that to say that earnings shall be credited has to proceed on the assumption that there are earnings. You can't completely level out the earnings line. There would be dips as well. I'm happy to try to address that later in rebuttal. I want to make sure we got this one. But it sounds like to me you've just dealt with the down risk one. And now tell me from the crediting rate, how does this contract not address that? But more importantly, I want you to get to distribution. Yes. So let me start with crediting, and then I'll move to distribution. Before I answer that, and I promise I'll answer it, I just want to take a step back and say that, Judge, when you're absolutely correct, that this is a unilateral contract, and so it hinges on the promises that were made in the original plan and whether those promises were defeated or diminished in some way after amendment. On the crediting rate, what this amendment did is it eliminated the key option that these employees accepted when they retired and elected their payout distribution scheme. But why didn't the plan specifically reserve the power to do that? Yes. Your Honor, under principles of unilateral contracts, to reserve the right to amend a plan, terms of a plan, after acceptance. That's what it did, and it spoke specifically to the credit rate. It did, but it did not... The provisions of the plan that the individuals in question signed on to specifically recognized that possibility. No, Your Honor, I don't agree with that premise. I think what happened here is that the employees accepted the crediting rate that was offered to them under the original terms of the plan. Now, the language you're referring to, the right to change the crediting rate, of course that's in the plan, but it does not grant the company the explicit right to amend after acceptance. Now, this is exactly... Because the company can change the crediting rate at any point up until acceptance. But it was set at acceptance. It can't mean retrospectively, because that's already happened. It had to refer to the plan as it was implemented going forward, or otherwise it's completely meaningless. Yes, Your Honor, going forward, but only going forward as to the active employees. Where in the plan, anywhere in the plan, is there that distinction? There is not that distinction in the plan. But the point of unilateral contracts, and again, the circuits are uniform on this point, that acceptance locks into place the terms that are offered to the employees at the time they retire.  Number one, these top hat plans differ from other types of welfare, of ERISA plans. In terms of providing less protection, because the beneficiaries of top hat plans are people who are in managerial positions, who are in better position than rank and file employees to take care of themselves financially. Not so, Your Honor. And again, the Third Circuit has... No, I don't disagree with... Let me clarify. I don't disagree with what you just said. I disagree that there are less protections. The protections are... That's exactly right. There are no... Well, their protections are contractual protections. So the reason that the Third... Correct. That's correct. Yes, Your Honor. That's absolutely correct. But that's why the Third Circuit, the Eighth Circuit, the Sixth Circuit, and the First Circuit have all said that when you're dealing with these top hat plans, because they are unilateral contracts... What do we make of this language? The plan could be wholly or partially amended by the board from time to time in its sole and absolute discretion, and the crediting rate... Including prospective payment. And the crediting rate in particular was subject to amendment by the board. Yes, and that allows the plan to make amendments and apply them to employees up until the point that they accept. There's no single word in the plan that distinguishes between... This is of a piece with Kemmerer, with New Valley from the Third Circuit. But my point is the language is the same, almost identical. In the Barr case, it's not binding, but it's persuasive. And there's a reason why those courts have ruled and come out the way that they have, which is that these employees have no protection once they retire. They are left only with the bargain that they had at the time. That included the recognition that it could be amended. No. And the Sixth Circuit looked at similar language in Barr, where they said this gives them discretion, and the rules that apply to top-hat plans, because they're unilateral contracts, require something more. Now, the company here could, in theory, have granted itself the right to make this contract illusory. And even if we take your argument on this, there is a specific clause in there addressing amendments to the credit rate. And that clause includes the term participants. And participants is being defined to include both employee participants and returnees. Yes, Your Honor, and that's what Judge Ellis hinged his decision on. No, Your Honor, because the requirement is, unilateral contracts require an explicit grant of a right to make amendments after acceptance. Unlike distribution, if you go back to distribution, you might have an argument there that is not there, and address that in this context, because it looks like your time is about to run out. I'll turn to that now, and I'm happy to come back and address lingering questions on rebuttal about the crediting rate. But when it comes to the distribution scheme, there is no specific amendment, Judge Duncan, like there was for crediting rate, that allows the company specifically to alter or change the distribution payout schedule that these employees elected when they retired. We think not. We think that it's a bright line rule that applies to all unilateral contracts. We think that all three would certainly fall or rise on the same rule. Yes, Your Honor. However, I think it's certainly the case that where the company here undertook and guaranteed equal distribution of these annual payments, including both within the plan, where there's language specifically saying that they, quote, and I'm quoting from J.A. 433, 434. Even distribution, to the extent possible? Is that the language? No, Your Honor, I'm pointing to the language that says that the equal payments, quote, shall be paid as specified in the election, shall be paid. Yes, Your Honor, but that's an administrative carve out. That's exactly what you're hanging your hat on with respect to the even up, the true up provision at the end of the plan. I don't agree, Your Honor. I think that the true up provision, as you're referring to it, is very different from a chain. But it doesn't refer to the principle of the accounts. It refers to the difference in the tenure averaging that might actually end up meaning that there are pluses and minuses on the last account. It doesn't refer to whether the accounts themselves are fundamentally shielded from the ups and downs of a volatile market option. Was there an option that allowed individuals upon retirement to take a lump sum? There was, Your Honor. I'm sorry? At the beginning of the year, I gather. Yes, Your Honor, but, and so this gets, I think, to another reason. They could do that and invest it in the Merrill Lynch. If they had been active employees when they retired and the amendment, so anybody who's at the company now, and this is, again, it goes, and I realize I'm running out of time, just to answer this. You have run out of time. You can answer the question, but it's going into the rebuttal. Thank you. I think it's a fundamental question, Your Honor. For active employees who don't like this new amendment, they are free to take the lump sum and invest that money elsewhere. The protections in place exist to protect retired employees who don't have that same option.  Good morning, Your Honors. My name is Deborah Davidson, and I represent the appellants. I'm sorry, the appellees. I'd like to address, first, why the court should not adopt the proposed unilateral contract theory, and second, why the plaintiff's claims fail, even under a unilateral contract theory with respect to Is it a contract of any sort? Is it a bilateral contract, or is it just not a contract? Well, there is language in the plan disclaiming the Is it a bilateral contract, or is it a unilateral contract, or is it a contract at all? It is an ERISA plan. It's not controlled by ERISA? It is. It is a TOPEP plan. It comes under ERISA laws and is controlled by? Yes. It is exempt from many of ERISA's substantive requirements. How do you enforce it? Through ERISA's civil enforcement provisions. It is still subject to those provisions. It is exempt from vesting rules and anti-forfeiture rules and fiduciary rules that apply to what I would call traditional retirement plans, like a pension plan or a 401k plan. But it is still subject to ERISA's civil enforcement provisions. The basis for the enforcement would be? The terms of the plan. And that's a claim under Section 502A1B of ERISA that allows participants the right to enforce their rights or clarify their rights under the terms of the plan. And that's the claim that we have here with respect to the application of these amendments to participants who have already retired. It's almost like a contract claim to me. You've got to go back to the plan and look at the terms of the plan to do it. And other circuits have looked at this and they've kind of applied the unilateral contract concept to it because they say if you don't, then it's fairly illusory not to do that. And then once you do that, you then take the three claims that have been made here and you look at it, distribution, credit risk and risk, and then you determine, does this plan allow them to make such an amendment? Because there's no general rule that says you can't do it. If the plan itself allows you to do it, yes, you can do it. You've got to look at the plan to see if this plan, in fact, allows you to do distribution, does it allow you to do credit risk, and does it allow you to amend insofar as the risk? Absolutely. It is the terms of the plan that control here. And that's one of the reasons why we take issue with this unilateral contract theory, because the appellants are asking the court to adopt a new rule that would require that a top hat plan can't be amended as to retirees unless the plan specifically says, we can amend even after you retire, even if the plan already contains a general reservation of rights. And so that theory would impose substantive requirements on the terms of top hat plans, even though Congress specifically exempted top hat plans from those types of substantive requirements that other traditional ERISA retirement plans. It's also your argument, as I understand it, that you would prevail even under unilateral contract principles, I believe? Yes, that's correct. And that's because the plan defines the term participants to include both active employees and retirees. And so the board's reservation of rights to amend the plan both in general and specifically with respect to the crediting rate applied to all participants, including active employees and retirees. How can you say the distribution is something you can amend when it says it shall be in approximate equal payments? There's nothing approximate equal about these payments. You get these small payments at the beginning, and then you get the big at the end. That's a whole different ball game, isn't it? And focus on the word shall, which is not present with credit rating and not present with the other risks. Focus on that word there when you answer that. So the entire plan was subject to amendment by the board, but with respect to the distribution. But I want to deal with the specific passages within the plan if we're going to go unilateral contract, because you've got one specifically dealing with credit rating, you've got a specific risk. But distribution, you've got this shall in approximate equal payments. Unless you contend that that means the payments that come out are approximate, which I'd like to understand how, because they don't look approximate equal to me. Well, the current distribution formula is as close to as administratively feasible. And the reason for the change is that under the pre-amended version of the plan, when there was this Merrill Lynch index in place. What about the and shall be paid in accordance with election? The participants are still receiving annual distributions. They are receiving payments that are as close to as administratively feasible equal. But the problem now is that under the four valuation funds that are in place from accrediting perspective, it is not feasible to be able to project what the returns are going to be. Is it the volatility? That's exactly the concern, that individuals who had assumed that they would have the benefit of a fairly stable income stream although do not believe that the options that you have offered approximate that relatively stable income stream. Although it seems some would come closer than others, but they do not approximate that to the extent that they did under the previous plan. But there was nothing in the plan that guaranteed that rate of return or the continued use of the Merrill Lynch index. To the contrary, the crediting rate was always subject to amendment by the board. And participants were informed every year when they made their election, so that's 18 years in a row for Plaintiff Plotnick, 14 years in a row for Plaintiff Kennedy, that not only was the plan in general subject to amendment by the board, but the crediting rate specifically. I want to make sure I understand in terms of your position. You're saying that volatility of this makes it difficult to make those kind of equalized payments. What's wrong with truing up in the last year, or at least as most of these things you do, you follow what the plan says, share approximate equal payments. You get to the end of it, then you make that decision as to what to do one way or the other toward the end. Well, the plan provides the plan administrator the discretion to apply the form of distributions in a manner that the administrator determines in its sole discretion. He doesn't have much discretion with the word shall. I got it in terms of distribution, so if he's got discretion, he can do a shall, but in the end he gets to sort of even it out. But the current method, though, is as close to approximately equal as is feasible, because bear in mind you have... Is there the same what I call true up period under this plan that minimizes the swings? The existing balance is divided by the number of remaining payments, so what ends up happening is that the payments go up in terms of value, if you assume a level rate of return. Now, as to the actual payments, those may vary from year to year, and that's completely dependent on the investment choices by the participant and the performance of those investments. And I guess the shall only, yeah, I guess you argue that there's flexibility in approximate too. Correct. But my question would be, you do get to change plans at any point. You can change plans as often as you like. Yes, that's correct. But what you've done, and maybe this is different for someone who qualifies for a top hat plan, which I essentially never would, but you're converting retirees into active investors. They are making day-to-day decisions based on the volatility of the market when they went into their retirements thinking that they had an option that would obviate that need. But they were always on notice of the board's right to amend that rate, and there was very specific language in the booklets that were provided to plan participants warning them. Before the amendments that were issued here, was there a choice of plans, investment vehicles that they could choose from, or was there just the one? No, it was just the one. Okay. And of these four, one must have been much more, they must range in how aggressive they are or not, right? Correct. And these are just all fact questions. I don't think we'll take long, but I wasn't clear on this. And when you say that they could choose to go to a new one at any time, is that just at the beginning or end of the year? Any day. Any day of the year. Okay. And when the administrator is making this determination about making approximately equal payments and it was decided that as close to equal as is reasonably administrative feasible, was an okay interpretation of that, is that determination within the administrator's discretionary authority? Yes. And that would be sort of standard ERISA law. Absolutely. Absolutely. And so then we would review that for reasonableness. Correct. And the vehicles, the four vehicles I think it is. Appellant's list gave us a dramatic variation in terms of volatility and fluctuation, but there was one that I would imagine, was it the money market one? There was one where I would imagine the level of volatility would be less. Correct. And that's the default if you don't make an election. That's correct. There is also a bond fund. There is a target date fund, which is 65 percent stocks, 35 percent bonds. And then there's an S&P 500 index fund, which tracks the performance of the S&P 500. And so participants who chose that investment option have done far better under the amended plan, because the S&P 500. Certainly. But that's been their choice to make. I'd like to address a few of the points made by Mr. Wessler. First, with respect to the 2003, there was a 2003 amendment to the crediting rate, which first established the Merrill Lynch crediting rate. There is no evidence that that amendment was applied any differently to retirees versus employees. To the contrary, CSC's verified sworn interrogatory responses stated that the amendment was applied to all participants alike. I asked counsel about that, and I was told that that was in response to IRS, certain IRS. That was a different amendment, Your Honor. But I'm talking, the plan amendment, and we're talking about the early one, about 10 years earlier. Yes. And there was also no differentiation between current and former employees. Correct. At one point, I think it's in the reply brief, the plaintiffs assert that under the terms of your argument, CSC could modify the plan to provide for a negative 10% crediting. And so that gets us to, there is a limitation on the board's authority to amend the plan, in that it could not enact an amendment that would reduce the balance of participants' accounts as of the date of the amendment. And this is not what happened here, but if there were an amendment that, as of January 1, 2013, we're applying a minus 10%, if that would result in the reduction as of the effective date of the amendment in participants' accounts, we might have a different issue here. That's not what happened here. No. But they could go minus 10% if the whole. In the future, but there's nothing in the plan that guarantees against losses in the future or market fluctuations, as is the case with the notional funds. And that's because the earnings through the Merrill Lynch Index up through January 1, 2013, that's remained in place. So this is only forward-looking. And so depending on the performance of the funds that participants choose, they might end up with greater balances, they may end up with losses, but that's subject to their choosing and the performance of those funds. How many people are in the Top Hat plans? Roughly. I think it's active and retiree, I think around 1,000. With respect to the retirees, I believe it's 200-something. The proposed class is around 140, 150. Let's see. I want to address a couple of other points that were made by Mr. Wessler. First, with respect to the unilateral contract case law. Is there any case that holds that the unilateral contract principles don't apply? Well, there's only been one circuit court that has actually adopted this theory in the Top Hat plan context. That's the Third Circuit. That's the obverse of the question I asked you. Is there anyone that says it does not apply? No, not that I'm aware of. The problem with calling it a unilateral contract, what happens if we do that as opposed to just using what you say is ERISA, but I don't see how you don't get that, because you've got to use contract principles somewhere. ERISA says you've got to look at the contract. You can't give it an unreasonable interpretation if the language of the contract is plain. What do you want to use if you don't use your unilateral contract? The terms of the plan. And the problem that we have with the unilateral contract theory is that it starts with a presumption that benefits can't be amended after a participant retires. That's the same type of presumption that the Supreme Court and this court has rejected in the context of retiree medical benefit plans. Because it says you can't amend it after it retires unless you look at the plan and it provides and allows for an amendment. That seems to be clean. What is the problem? What they are looking for is a requirement that the plan not only reserve the right to amend the plan, but that it also go the extra step of staying and we can amend it after you retire. Reservation is a general reservation. It's a very general type blanket reservation of amendment. And yet if you look at the plan and you see something specific in it, why would you just let that trump and not look there? Well, there is both a general, in this case, there is both a general reservation. It doesn't matter. Correct. Well, in distribution, then that brings us back to the question of administrative feasibility. That's a general term. Then you have the specific language of shall right there and it says shall and you have the participant having made an election. He made an election to receive equal payments and that's irrevocable. Approximately equal payments. But that's irrevocable. Is there anything that, if this is a unilateral contract, what principle does that vest at retirement? Why is that the determinative factor, assuming that this is a unilateral contract? I'm sorry. When does the contract complete? Under that theory, it is when a participant retires. But you still look to the terms of the plan to see specifically what vested and what rights were still reserved by the plan sponsor. And here there was always the right reserved by the plan sponsor to amend the plan in general and the crediting rate specifically. And the distributions, you can't separate the distributions from the crediting rate. Because under the amended. That's correct. And you can follow through for what you contracted to do. You make an irrevocable election. He can't get out of it at that point. He can't get his lump sum once he does this. And look at the harm that's coming to the participant. You want to now pay him a little bit or a lesser amount. There's no such thing as a little bit in this thing. A lesser amount at the beginning and more down at the end. All this risk is now transferred to the beginning. What if this company goes out of business? What is the investment you can make when you get money later on? They didn't contract to do that. They said we elect to get these equal payments. We know what we're getting. Now you've made this big disparity in terms of what they're getting. And that doesn't change distribution in a material way? The distribution can't be separated from the performance of the crediting rate. You have to construe the plan as a whole. The current system is the best way to reconcile the change in the crediting rate with the distribution options. And to make those payments as close to approximately equal as is feasible, given all of the variations in terms of how participants might choose to allocate their investments. I take it from your answers to my earlier questions that there are other folks in the same, and indeed there's this motion for class action and so forth. And I thought I read in your briefs that some employees had fared better under the amendments than they had under the old plan. Is that correct? That's correct. Approximately 40% of the putative class is financially better off under the amended plan than under the pre-amended plan. Where is that? Could we find that in the JA somewhere? Yes, that's at 136 and 161 through 166 in the factual record. It's also addressed in the district court's opinion. Your colleagues on the other side are going to have a chance to get up and tell us what they think. So this is the time to tell us if there's a problem with those figures or how they could be looked at differently. Well, there was certainly an existing conflict between those putative class members and the plaintiffs. There are also plan participants, there were eight as of the time of the district court's ruling, who had been paid out completely and were better off. And so they certainly don't have an interest in potentially having to repay the additional money that they have received under the amended plan. And the conflicts here are not specific just to damages or remedies. The conflicts relate to liability in the first instance. No, I understand that. I wasn't really going to the class action. I was really just going to the underlying figures that we were talking about. We're not going to get any pushback about your 40% is take it to the bank number. It's in the record. Yes. How are you going to respond if your opponents get up and ask, well, there's a previous version of the plan that separated distribution and credit rate? How are you going to respond? It moved from one index to another. So prior to 2003 there was a different index that tracked, I'll call it the treasury index. It was similar, at least in concept, to the Merrill Lynch index. Yes. Because there was only the one. Correct. So you could estimate it on an annual basis and then just divide the total by the number of installments. So is one of the problems here that you can change plans? I mean, change investment vehicles? That is the primary reason that the old system doesn't work anymore. No, but is that the primary reason why they can't be approximately equal distributions? Yes, the volatility. Before there was only the one. Correct. And now there are four. And it's not just the one. You can allocate 25% in each of the four. And you can change that every day. Okay. Thank you. Just a few brief points, Your Honor, in response. I just want to pick up on Judge Wynn's questioning of the risk element of this plan. It's not just that the language in the plan bound the company to pay for the insurance to pay out based on the elections that these employees made. It's also in the letters that they sent confirming the payout scheme. And Judge Duncan, you asked about this question, this true-up feature of the plan. And I point the Court to JA 1459 and 1460, which is an example of a letter that these employees received after they elected their distribution scheme. And that letter lays out the payout, the annual payouts. It says you get, one of them is $363 and some odd dollars per year. Except in the last year of that payout scheme, we can make some adjustments based on how that averaging interest affects how much we owe you. But the key language in that letter, which confirms that this is a binding promise that this company made and that was accepted by performance by these employees, is the sentence below the table in that document. And it says your annual payments will remain the same until your last payment. That constitutes a binding promise that was accepted when these employees retired and elected the payout scheme. There's no dispute that the company has utterly changed that payout mechanism. The annual payments now are up and down, up and down. To go, Judge Motz, to your question about, well, you know, didn't some of these retirees do better? I thought you had represented that none of them did better, all of them did worse. And so I was trying to marry that. If I did, that's not what I intended to do. But I also, I object to the premise that there's a winner and a loser here. Doing better on a year-to-year basis is not what these employees created. I completely get that. The thing, though, is it's still driven by the investment vehicles that the individual chooses. And they can change every day. And they can change more significantly percentages among them every day. Your Honor, I understand what this vehicle allows. Although they could all stay in the money market, which is safer. But you cannot stay in the one option that you had and expected and accepted when you retired. And so the injury here, if we're talking about. It's in the credit mechanism. But it's not just the credit mechanism, right? I mean, just to respond specifically to your, you know, you can mix and match and play the markets every day and change the allotment. That's not what these employees wanted with their retirement. No, I completely agree. And so they fundamentally now are being forced into a version of this retirement that was not promised to them and that they did not accept when they retired. Now, I don't think that would be actually even disputed by the company in this case. I think this case does hinge on whether under unilateral contract principles, the amendment clause, the generic language that we've been going back and forth over, is sufficient to allow the company to make these changes post-retirement. And I would suggest, and I think the cases bear this out, that if this court embraces that principle, it would be the first appellate court in the country to do so, and it would be adopting a novel rule that has never been applied in the context of unilateral contracts. There's not a single case, if I could just finish this last thought, a single case that the CSE has cited that supports an interpretation of this generic amendment language to unambiguously allow for post-retirement amendments. There just isn't. The closest they come is an unpublished case called CRAM, and in that case, they say, that shows that we're right, that there was a definition of participants that the court seized on there. So it's similar, but the one difference, and again, this is crucial, is that in addition to the definition of participants, in the actual amendment language, the clause said, and these changes can be applied to both active and retired employees. Under these principles of unilateral contracts, there needs to be some explicit grant of the right to amend. Otherwise, as the Third Circuit has explained, the terms that were in effect when the employees retired are irrevocable, and the only way to overcome that rule is to include a specific grant of authority that the changes can be made after retirement. And there's no dispute that the language in this plan did not hand the company that right. If the Court has no further questions, thank you. Thank you very much for your argument.
judges: Diana Gribbon Motz, Allyson K. Duncan, James A. Wynn Jr.